**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DANIEL LEE BEDFORD,**

        **Petitioner,**

  **v.**                    **Case No.  1:11-cv-311**
                                  **JUDGE ALGENON L. MARBLEY**
**DAVID BOBBY, Warden,**          **Magistrate Judge Terence P. Kemp**

        **Respondent.**

## OPINION AND ORDER ON MOTION FOR A STAY OF EXECUTION

Petitioner Daniel Lee Bedford, a prisoner sentenced to death by the State of Ohio and scheduled to be executed May 17, 2011, has filed a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254, as well as a motion for a stay of execution.  (ECF No. 1.)  This matter is before the Court upon Petitioner's motion for a stay of execution (ECF No. 1), Respondent's memorandum in opposition to a stay of execution (ECF No. 12), and Petitioner's reply (ECF No. 14).  The Court conducted an oral argument hearing on Monday, May 16, 2011.  For the reasons that follow, Bedford's motion for a stay of execution is **GRANTED**.  It is therefore **ORDERED**, **ADJUDGED**, and **DECREED** that the State of Ohio, and any person acting on its behalf, is hereby **STAYED** from implementing an order for the execution of Daniel Lee Bedford issued by any court of the State of Ohio until further Order from this Court.

### I.  BACKGROUND

Petitioner, Daniel Lee Bedford, is currently scheduled to be executed by the State of Ohio on May 17, 2011.  Bedford was sentenced to death on November 6, 1984, for the aggravated murder of Gwen Toepfert.

The facts presented at trial are that in 1978, Bedford met Toepfert, whose father owned the bar where Bedford worked.  For the next several years, the two were involved in an "on-again, off-again" relationship.  By 1984, they were estranged.  On April 21, 1984, Bedford visited Toepfert's apartment bearing a gift and hoping to make amends, but instead learned that her new boyfriend John Smith was there.  In the early morning hours of April 24, 1984, Bedford

gained entry into Toepfert's apartment and shot and killed both her and John Smith. At the time of the murders, Toepfert's roommate, JoAnn Funk was present in the apartment and observed most of what transpired in the apartment. Bedford then fled to Tennessee and visited a former acquaintance to whom Bedford eventually confessed that he had killed two people. Bedford's acquaintance turned him in, and the Tennessee police arrested Bedford. Bedford gave a statement admitting the crimes and later gave a similar statement to the Cincinnati authorities.[1]

## II. PROCEDURAL HISTORY

Following a jury trial, Bedford was convicted of the aggravated murder of Toepfert and the murder of Smith. After a mitigation hearing, the jury recommended the death penalty, and the trial court agreed. Bedford's conviction and death sentence were upheld by the state court of appeals and the Ohio Supreme Court. *See State v. Bedford*, No. C-840850, 1986 Ohio App. LEXIS 8608 (Ohio Ct. App. Oct. 8, 1986); *State v. Bedford*, 39 Ohio St.3d 122 (1988). Bedford sought state post-conviction relief, which the Ohio courts denied. *See State v. Bedford*, 1991 Ohio App. LEXIS 4252 (1st Dist. Ct. App. 1991) (per curiam), appeal denied, *State v. Bedford*, 583 N.E.2d 1320 (Ohio 1992). Bedford then filed a motion for reconsideration and another seeking reinstatement of his direct appeal, both to no avail. *See State v. Bedford*, 626 N.E.2d 957 (Ohio 1994); *State v. Bedford*, 622 N.E.2d 656 (Ohio 1993).

In 1992, Bedford filed a petition for habeas corpus relief. (Case No.: 1:92-cv-00547). The Honorable George C. Smith denied his habeas petition. *Bedford v. Collins*, 2007 U.S. Dist. LEXIS 33875 (S.D. Ohio 2007) (Smith, J.). The Sixth Circuit Court of Appeals affirmed that judgment. *Bedford v. Collins*, 567 F.3d 225 (6th Cir. 2009). Thereafter, the United States Supreme Court denied Bedford a writ of certiorari by the United States Supreme Court. *Bedford v. Collins*, 130 S. Ct. 2344 (2010).

On May 9, 2011, Bedford filed a Notice of Insanity pursuant to Ohio Rev. Code §

_____

[1] The full details of the underlying case are not included because they have been fully set forth in the state courts' decisions and this Court and the Sixth Circuit's orders on Bedford's habeas corpus petition and because they are not relevant to the instant proceedings.

2949.28 in the state trial court.  Bedford submitted in support of his notice numerous exhibits, including the expert opinion of Dr. Nicholas Doninger that Bedford is not competent to be executed.  The state opposed Bedford's motion, and submitted in support the affidavit of Dr. Carla S. Dreyer, who had reviewed the evaluations that Bedford's experts conducted, as well as the affidavit of Cynthia Mausser, who was the chair of the parole board panel that interviewed Bedford in connection with his clemency proceedings.  (ECF No. 12-1, at 9-12; 31-32.)

### III.  STANDARDS FOR CONSIDERING MOTION FOR STAY OF EXECUTION

**A.     28 U.S.C. § 2251 Standard**

United States federal courts before whom a habeas corpus petition is pending are vested with the statutory authority to stay an execution pursuant to 28 U.S.C. § 2251.[2]  In *Lonchar v. Thomas*, 517 U.S. 314 (1996), the Supreme Court addressed the authority of the district courts to stay an execution.  In considering the issue, the Court held that "if the district court cannot dismiss the petition on the merits before the scheduled execution, it is obligated to address the merits and must issue a stay to prevent the case from becoming moot."  *Id.* at 320.

Bedford's execution is scheduled for Tuesday, May 17, 2011.  This petition was filed on Friday, May 13, 2011.  In the petition, Bedford relies on *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007), to argue that: (1) he made a threshold showing of incompetency in state court in accordance with the state *Ford* statute, but the state court denied him the procedural due process that the Constitution requires; and (2) he is not competent to be executed.  In support of this petition, Bedford has presented this Court with a large volume of evidence, including affidavits and reports from two mental health experts who evaluated him in 2009 and 2010, records from the Depart of Rehabilitation and Correction, and evidence of significant intellectual impairments.  The State has responded with evidence of its own: evaluations of Bedford's experts, and anecdotal evidence of the interaction between

---

[2]The Antiterrorism and Effective Death Penalty Act of 1996 did not amend § 2251. Accordingly, the principles and case law that are derived from § 2251 remain intact.

Bedford and the parole board during Bedford's clemency hearing.

This evidence creates significant conflicts of fact and law, both as to whether Bedford was denied his procedural due process rights and as to whether he is competent to be executed. Accordingly, this Court cannot dismiss the petition on the merits before tomorrow's scheduled execution. Thus, this Court finds that it is necessary to stay Bedford's execution in order to allow consideration of the habeas petition that is proper, thorough, and in accordance with Ohio law and the Constitution of the United States.

**B. Balancing Standard**

This Court has found that under § 2551 and *Lonchar*, it has the authority to issue stays of execution if the case so requires. Some courts, however, have gone further, and used the equitable standards that guide the issuance of a temporary restraining order of preliminary injunctive relief to guide their determinations regarding stays. *See In re Holladay*, 331 F.3d 1169, 1176-77 (11th Cir. 2003) ("We consider four factors in determining whether a stay of execution is appropriate under 28 U.S.C. § 2251: "[W]hether the movant has made a showing of likelihood of success on the merits and of irreparable injury if the stay is not granted, whether the stay would substantially harm other parties, and whether granting the stay would serve the public interest.") (quoting *Bundy v. Wainwright*, 808 F.2d 1410, 1421 (11th Cir.1987)). As the parties addressed these factors in their briefs and at oral argument, the Court will consider them here.

In the Sixth Circuit, it is well-settled that the following factors are to be considered in determining whether a temporary restraining order is necessary:

> (1) whether the movant has a strong or substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the relief requested; (3) whether issuance of the injunction will cause substantial harm to others; and (4) whether the public interest will be served by issuance of the injunction.

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004). The factors are not prerequisites; rather, they must be balanced. *Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir. 2004); *see also Michigan Bell Tel. Co. v. Engler*, 257 F.3d

587, 592 (6th Cir. 2001) (no single factor is determinative.); *Monongahela Power Co. v. Schriber*, 322 F. Supp. 2d 902, 918 (S.D. Ohio 2004).

The decision whether to issue a preliminary injunction falls within the sound discretion of the district court. *See Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (*citing Stenberg v. Checker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978)). After consideration of these four factors, this Court finds that balancing of them supports its finding under § 2251 that a stay is warranted.

Because stays or other injunctive relief are equitable in nature, the Court addresses at the outset whether Bedford engaged in undue delay or otherwise dilatory actions in developing and presenting his *Ford*-based claim that he is incompetent to be executed. For the reasons that follow, this factor does not so militate against Bedford as to make equitable relief inappropriate. First, *Ford* claims, by their very nature, do not become ripe until execution is imminent. *See, e.g., Steward v. Martinez-Villareal*, 523 U.S. 637, 637 (1998). Thus, notwithstanding Respondent's argument that Bedford expressed questions about Bedford's competency to be executed as early as his May 3, 2010 memorandum opposing the state's motion to set an execution date, the fact that Bedford did not file his *Ford* petition until after his execution date was set is not dispositive to the issuance of the equitable relief of a stay, due to the law concerning the "ripeness" of *Ford* claims. On February 8, 2011, the Ohio Supreme Court set Bedford's execution date for May 17, 2011. Although Bedford did not file his *Ford* petition in the state trial court until May 9, 2011, the record demonstrates that he was exercising due diligence in developing that claim from the time that his current counsel began representing him, in September 2009, until the time that he filed his *Ford* petition on May 9, 2011. For example, Bedford was first evaluated by Dr. Nicholas Doninger, a neuropsychologist, in December 2009.

5

Bedford was evaluated by Dr. George W. Woods, a licensed physician specializing in neuropsychiatry, in December 2010.  Numerous times in the interim, Bedford was visited by his counsel or their investigators.  (ECF No. 12-1, at 61, 69.)

It is also relevant, for purposes of equity, if of only qualified weight, that in addition to developing his *Ford* claim, Bedford's counsel were engaged in preparing for Bedford's clemency hearing and litigating a claim that Bedford is mentally retarded and therefore ineligible for the death penalty.  The Court further notes, as Bedford did in his reply (ECF No. 14, at 19), that Ohio's *Ford* statute contains no time requirement.  Finally, Bedford is not unlike the petitioner in *Panetti*, who was also within a day or two of his execution when he sought and received a stay of execution from a federal district court in order to allow the state courts more time to consider the evidence.  *Panetti*, 551 U.S. at 938.  That is all that Bedford is requesting here: a stay of execution not necessarily for a ruling on the merits of his *Ford* claim that he is incompetent to be executed, but for time to return to the state courts to complete his appeal from the trial court's summary finding that he did not show probable cause that he is insane and for leave to amend his petition accordingly.  (ECF No. 1, at 4-5.)  For all of these reasons, the record does not support a finding that Bedford engaged in inexcusable delay or otherwise dilatory actions in presenting his *Ford* claim to the state courts sufficient to make equitable relief unsuitable.

## 1.    Likelihood of Success on the Merits

Having settled this threshold issue, the Court turns to the first of the four factors to be balanced–whether Bedford demonstrates a strong or substantial likelihood of success on the merits.  Bedford demonstrates to this Court's satisfaction a strong or substantial likelihood of success on the merits on his claim that the Ohio courts unreasonably applied clearly established federal law when they failed to afford him procedural due process adequately to protect his right not to be executed while incompetent.

The clearly established federal law governing review of the competency issue that

Bedford raises in his habeas corpus petition is *Ford v. Wainwright*, 477 U.S. 399 (1986).  There, the United States Supreme Court held that the Eighth Amendment prohibits states from executing individuals who are insane.  The Supreme Court stopped short, however, of setting forth a definition of what constitutes "insanity," although Justice Powell suggested in a concurring opinion that, "I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are about to suffer it."  *Ford*, 477 U.S. at 422.  The Supreme Court subsequently endorsed that standard in *Panetti v. Quarterman*, 551 U.S. 930 (2007), framing the Eighth Amendment question before it as follows: "whether the Eighth Amendment permits the execution of a prisoner whose mental illness deprives him of the mental capacity to understand that [he] is being executed as a punishment for a crime."  551 U.S. at 954 (internal quotation marks and citation omitted.) Ohio's *Ford* statute is set forth in Ohio Rev. Code § 2949.28(A); the Sixth Circuit expressly approved it in *Scott v. Mitchell*, 250 F.3d 1011, 1013-14 (6th Cir. 2001):

> [T]he definition of insanity set out in Ohio's *Ford* statute, Ohio Rev. Code Ann. § 2949.28(A), provides the appropriate standard for determining whether [a petitioner] is competent to be executed.  That definition is:  "that the convict in question does not have the mental capacity to understand the nature of the death penalty and why it was imposed upon the convict."

*See also Coe v. Bell*, 209 F.3d 815, 826 (6th Cir. 2000) (approving the same standard as set out in Tennessee's statute).

According to Justice Powell's concurring opinion in *Ford* and the majority opinion in *Panetti*, it is clearly established law that "[o]nce a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness. *Panetti*, 551 U.S. at 949 (quoting *Ford*, 477 U.S. at 426, 424 (opinion concurring in part and concurring in judgment)). The Court concludes in the first instance, for the reasons that follow, that Bedford demonstrates a strong or substantial likelihood of succeeding on the merits of his claim that the state trial court unreasonably applied clearly established federal law when it failed to afford him procedural due

process.  *Panetti* provides a solid foundation for finding that the Ohio courts unreasonably applied clearly established federal law by resolving factual conflicts about Bedford's competency on the basis of a paper record.  The Supreme Court in *Panetti* held that no deference was due to the state courts' decision rejecting Panetti's *Ford* claim, explaining that "[t]he state court's failure to provide the procedures mandated by *Ford* constituted an unreasonable application of clearly established law as determined by this Court."  *Panetti*, 551 U.S. at 948.  In *Panetti*, it was uncontested that the condemned had made a substantial showing of incompetency under *Ford*.  In the instant case, although the state vigorously contests whether Bedford demonstrated probable cause that he is insane as defined by Ohio's *Ford* statute, Ohio Rev. Code § 2949.28(A), the state trial court finding that Bedford did not demonstrate probable cause is questionable in so much as the trial court in Bedford's case, like the state trial court in *Panetti*, based its ruling on the state expert's paper review of the evaluations of Bedford's experts.

In *Panetti*, the Supreme Court seized upon Justice Powell's concurring opinion in *Ford* to make clear that once a prisoner under sentence of death makes a substantial threshold showing of insanity, the protection afforded by procedural due process includes a fair hearing in accord with fundamental fairness.  *Panetti*, 551 U.S. at 949 (citing *Ford*, 477 U.S. at 426).  The problem in the instant case is that the state trial court made its probable cause finding on the basis of a paper record that presented on its face factual disputes.  In so doing, the state trial court unreasonably applied clearly established federal law.  The Supreme Court in *Ford* recognized the inherent risks of arbitrariness and error inherent when conflicting expert opinions are resolved based solely on a paper record.  *Ford*, 477 U.S. at 414-15; *see also* 477 U.S. at 424-25 (Powell, J., concurring).  Bedford was evaluated by both Dr. Nicholas Doninger and Dr. George Woods.  Dr. Doninger stated in his report that, "To a reasonable degree of psychological certainty, it is my opinion that because of the presence of well-documented and severe mental illness, Mr. Bedford lacks the capacity to formulate a rational understanding of the reasons why the death penalty was imposed on him."  (Petitioner Exhibit 1, Ex. A, Forensic Evaluation of Dr. Nicholas Doninger, at

8

2.)  Dr. Woods concluded from his evaluation that Bedford suffers from mental illness and severely impaired cognitive functioning, that Bedford's mental state has further deteriorated recently due to the onset of a dementia form of illness, and that Bedford suffers from essential hypertension which is the foundation for multi infarct dementia.  (Petitioner Exhibit 1, Ex. A3, Dr. George Woods declaration at 1, 6.)  The prosecution presented to the state trial court the affidavit of Dr. Carla S. Dreyer, who admittedly did not evaluate Bedford.  (ECF No. 12-1, at 9.) Dr. Dreyer opined, based on a review of the evaluations of Drs. Doninger and Wood, as well as other materials, that, "[i]t is my professional opinion, to a reasonable degree of psychological certainty, that the affidavit/report of Dr. Doninger does not overcome the presumption that Mr. Bedford is sane, as defined for the purposes of Ohio Rev. Code §2949.28."  (*Id*. at 10, ¶ 13.) Once the paper record presented conflicts of fact and credibility, *Ford* and *Panetti* required an evidentiary hearing.  For that reason, Bedford demonstrates to the satisfaction of this Court a strong or substantial likelihood of succeeding on his claim that the Ohio trial court unreasonably applied clearly established federal law by the manner in which it dismissed Bedford's notice of insanity without a hearing and the other procedural protections due.

In this regard, it is worth noting that in *Panetti*, the applicant presented a letter and a declaration, from a law professor and a psychologist respectively, who had both interviewed the applicant the day before his execution.  That evidence was enough to persuade the Supreme Court that the applicant had made a substantial threshold showing of insanity sufficient to warrant a full hearing in the state courts.  In the instant case, Bedford presented to the state trial court materials documenting not one but two evaluations conducted by Dr. Doninger, as well as materials documenting an evaluation by Dr. Woods, and records from the Ohio Department of Rehabilitation and Corrections documenting Bedford's mental and medical impairments. Bedford demonstrates a strong or substantial likelihood of succeeding on his claim that the state trial court unreasonably applied *Ford* and *Panetti* when it failed to afford Bedford the process he was due once he had made a probable cause showing of insanity.  The evidence here supporting

9

a finding of probable cause was more substantial than the evidence that was presented in *Panetti*. Bedford was entitled to full due process because the evidence presented factual and credibility conflicts that could not properly have been resolved on a paper record.

Bedford argues that he demonstrates a substantial likelihood of succeeding on his claim that he was deprived of procedural due process and that once he is afforded that process, he will be able to demonstrate a substantial likelihood of succeeding on his *Ford*-based claim that he is incompetent to be executed under the Eighth Amendment.  The Court agrees that Bedford presents a substantial constitutional question in this regard, one that this Court is in no more position than was the state trial court to render an opinion on in the absence of a more fully developed record.  That said, the Court is satisfied that Bedford demonstrates that *once* he is afforded the process he is due, he stands a stronger likelihood than he does in the absence of those procedural due process protections of succeeding on his claim that he is incompetent under *Ford* and *Panetti*.

Relying on affidavits and reports of two mental health experts who evaluated him in 2009 and 2010, Bedford argues that he lacks the capacity to have a rational understanding of the reasons for his death sentence.  As set forth in Bedford's petition and supported by accompanying exhibits:

> At the present time, [Bedford] has no actual memory of committing the offenses; while Bedford "can appreciate in a hypothetical sense the factual predicates underlying his punishment, a chronic mental disorder has placed a series of events in a context far removed from his own sense of reality."  (Petitioner Exhibit I, Ex. A, Forensice Evaluation of Dr. Nicholas Doninger at 2.)
>
> Bedford suffers from mental illness and severely impaired cognitive functioning.  (Petitioner Exhibit 1, Ex. A3, Dr. George Woods declaration at 1, 6.) His brain is "globally and significantly impaired."  (*Id*. at 1.)  He lacks intact temporal lobe functioning, which is crucial to adequate memory.  (*Id*. at 2.) Bedford's frontal lobe functioning is also impaired, and the "breakdown of executive functioning in the frontal lobes of the brain hinders his ability to adequately sequence thoughts and ideas so that he can meaningfully understand information and situations."  (*Id*.)  Bedford has motor deficits that indicate neurological malfunction. (*Id*. at 5.)  When his memory loss "became so evident that prison officials noticed it, they reported problems with Mr. Bedford's speech and walking."  (*Id*.)  His right parietal lobe is impaired, which has compromised his ability to conceptualize.  (*Id*.)  Bedford lacks the ability "to see the big picture,

either metaphorically or literally." (*Id.*)

(Petition, at 4-5.)  Bedford goes on to argue in his petition, as supported by accompanying exhibits, that his mental state has deteriorated even further with the onset of a dementia form illness and accompanying or contributing medical ailments.  These conditions, Bedford argues on the basis of his experts' opinions, have made Bedford's already poor memory worse, leaving him with no personal recollection, independent of what others have told him, of his commission of the murders for which he is to be put to death.

Respondent counters that the state trial court reasonably concluded that the evidence that Bedford presented did not warrant further inquiry because it amply demonstrated that Bedford understands what it means to be executed and that he will be executed for murdering two people. (ECF No. 12, at 3.)  Respondent relies on the opinion of an expert, Dr. Carla Dreyer, who evaluated not Bedford himself, but the evaluations of Bedford's experts, as well as on an affidavit of Cynthia Mausser, the chairperson of the parole board panel that interviewed Bedford in connection with his clemency proceedings.  Dr. Dreyer opined, as noted above, to a reasonable degree of psychological certainty, that Dr. Doninger's evaluation does not overcome the presumption that Bedford is competent and that Bedford is in fact sane.  Ms. Mausser opined that "[i]t was clear to the Board that Mr. Bedford understood he was on death row for the murder of two people and that he was being interviewed by the Board in connection with his application for executive clemency."  (ECF No. 12-1, at 32.)  Respondent's argument that the trial court reasonably concluded that Bedford did not demonstrate probable cause sufficient to warrant further inquiry appears counter to *Panetti*.

In *Panetti*, the condemned had argued before the Texas courts and lower federal courts that he was incompetent to be executed because mental illness, giving rise to a severely delusional belief system, rendered him unable to reach a rational understanding of the reason for his execution.  The state courts and lower federal courts rejected that claim on the basis of the conclusion of two experts appointed by the state trial court that Panetti knew he was to be

executed, that the execution would result in his death, and that he was being executed because he had murdered two people.  The Supreme Court found that interpretation of *Ford* too restrictive. *Panetti*, 551 U.S. at 956-58.  As the Supreme Court explained:

> We likewise find no support elsewhere in *Ford*, including in its discussions of the common law and the state standards, for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found he can identify the stated reason for his execution.  A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it.

*Panetti*, 551 U.S. at 959.  *Panetti* suggests that a condemned's mere awareness that he is being executed and why may be insufficient to establish a rational understanding about his execution sufficient to permit his execution under the Eighth Amendment, when there is evidence undermining the basis or nature of his awareness.  This provides a basis for finding that Bedford, assuming he is afforded a full hearing and other due process, has a stronger likelihood than he does now, on the basis of only a paper record, of succeeding on the merits of his claim that he is incompetent to be executed.  Panetti argued that documented mental illness giving rise to severe delusions compromised his ability to form a rational understanding of the reason for his execution.  Bedford argues that multi-infarct dementia, globally impaired functioning, exasperated by other medical conditions such as hypertension, leave him incapable of forming a rational understanding of the reasons why the death penalty was imposed on him.

### 2.  Irreparable Harm

Continuing to the second factor, Bedford argues and the Court agrees that the failure to stay his execution before he has a chance fully to litigate his *Ford*-based incompetency claim would cause him irreparable harm.  Bedford is scheduled to be executed on May 17, 2011.  And the death penalty is an irrevocable sanction.

### 3.  Harm to Others

Regarding the third factor, Bedford argues that allowing him the opportunity to exercise his substantive right not to be executed if incompetent will not result in harm to others.  His argument is well taken.  Although the Court recognizes and respects that the state is harmed

12

when execution of valid criminal judgments is delayed without just cause, that factor does not favor the state where, as here, there exists the very real possibility that an error of constitutional dimension has occurred that has not been fully litigated and that will become moot with Bedford's execution.  *Cf. Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (stating that if a substantial likelihood of success is shown of a constitutional violation, no substantial harm to others can be said to inhere in enjoinment).

> 4.    **Public Interest**

With respect to the fourth and final factor, Bedford argues that " 'the public interest favors protecting constitutional rights.' " (ECF No. 1, at 5.)  The Court agrees that the protection of constitutional rights is always in the best interests of the public.  As discussed more fully above, this Court has found a strong or substantial likelihood that an error of constitutional magnitude has occurred.  Against that backdrop, the Court finds that the public interest is served by permitting Bedford fully to litigate his right not to be executed if he is incompetent.  *Cf. Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (" 'the public interest lies in a correct application' of the federal constitutional and statutory provisions upon which the claimants have brought this claim, *id*., and ultimately (in view of our interpretation of those provisions) upon the will of the people of Michigan being [a]ffected in accordance with Michigan law.") (quoting *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991)).

Examining and balancing the four preliminary and permanent injunction factors together, the Court concludes that the issuance of a stay of execution is warranted in this instance.

**C.    Conclusion**

For the foregoing reasons, Bedford's motion for a stay of execution is **GRANTED**.  It is therefore **ORDERED**, **ADJUDGED**, and **DECREED** that the State of Ohio, and any person acting on its behalf, is hereby **STAYED** from implementing an order for the execution of Daniel Lee Bedford issued by any court of the State of Ohio until further Order from this Court.

## IV. EXHAUSTION

The Court is not persuaded that the exhaustion requirement in habeas corpus speaks to this Court's issuance of a stay of execution. According to 28 U.S.C. § 2254(b)(1):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). The Court is not persuaded that its issuance of a stay of execution violates any exhaustion requirement, or the principles of federalism and comity underlying the requirement, for the following reasons. First, the Court is not granting habeas corpus relief on an unexhausted claim; rather, it is issuing a stay of execution to allow the claim to be fully litigated. Second, even assuming the exhaustion requirement applied to the decision to issue a stay, Bedford would have a strong argument, in light of the Court's decision above, that circumstances exist that render Ohio's *Ford* process ineffective to protect Bedford's rights. Third, the Court is satisfied from the record that Bedford has diligently attempted to present not only his *Ford* claim, but also his request for a stay of execution, to the state courts first. (ECF No. 14, at 25.) Finally, the Court notes that exhaustion does not appear to have been an impediment in *Panetti*, where the applicant was in nearly the same procedural posture as Bedford herein. The district court in *Panetti* stayed the applicant's execution one day before it was to proceed in order to allow the state courts more time to fully consider the evidence concerning the applicant's *Ford* claim. *Panetti*, 551 U.S. at 938. At the time of the writing of this order, the Hamilton County Court of Appeals affirmed the trial court's finding that Bedford did not establish probable cause of insanity. That does not, however, speak to the determination of whether a stay of execution is warranted.

## V.  CONCLUSION

For the foregoing reasons, Bedford's motion for a stay of execution is **GRANTED**.  It is therefore **ORDERED**, **ADJUDGED**, and **DECREED** that the State of Ohio, and any person acting on its behalf, is hereby **STAYED** from implementing an order for the execution of Daniel Lee Bedford issued by any court of the State of Ohio until further Order from this Court.

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**United States District Judge**